BOARD OF PARK COMMISSIONERS ET AL., APPELLEES, *v.*
KRUMREIG, APPELLANT.

(No. 22845—Decided November 16, 1953.)

*Messrs. Green, Lausche & Wilmot,* for appellee
Board of Park Commissioners.

*Mr. Charles F. Ross,* director of law, for city of Lakewood.

*Mr. Frank T. Cullitan,* prosecuting attorney, and *Mr. A. M. Braun,* for the county commissioners.

*Messrs. Rich & Chesney,* for appellant Edward L. Krumreig.

SKEEL, J. This appeal comes to this court on questions of law and fact from a judgment for the plaintiff on its petition seeking an injunction preventing the defendant, Krumreig, from using park properties in furtherance of and in conjunction with his business of transporting passengers for hire or bringing upon the premises of the park board boats or other equipment for that purpose. At the time the defendant filed his answer and cross-petition he made the United States, the city of Lakewood, and the county of Cuyahoga parties defendant.

The plaintiff's petition alleges plaintiff's authority as a body politic and corporate under the laws of Ohio. In 1924 the park board, by agreement with the city of Lakewood, took over the control and development of about 79 acres owned by the city in Rocky River Valley, just south of the Detroit-Rocky River Bridge, which was at the time known as Lincoln Park. In conformity with the agreement, the park board established roads, playgrounds, picnic areas and in a general way supervised the area in connection with other property to the south for recreational and public park purposes. The park board then alleges that the defendant, Krumreig, who is in the business of transporting passengers for hire on pleasure and fishing trips on Rocky River and Lake Erie, is attempting to and does use park property in connection with his commercial business, without the consent of the park board, thus interfering with the recreational use of park property, and seeks to enjoin him from making such use of the park property.

The amended answer and cross-petition of defendant, Krumreig, admits the corporate capacity of the park board as provided by law and the acquisition of the use of Lincoln Park by agreement dated April 14, 1924, with the city of Lakewood, in connection with Metropolitan Park, admits that the copy attached to plaintiff's petition is a copy of such agreement, and that said agreement is still in force and effect, but denies, for want of knowledge, that the park board took possession of the property and developed and improved it as a public park and for recreational purposes. The defendant denies all the other claims of the plaintiff and alleges that any use he has made of the park property was in connection with and necessary in making use of the ''Port of Lakewood'' as he had a legal right to do; that the ''Port of Lakewood'' was created (its facilities including the roadways thereto for public use) by agreement between the city of Lakewood, the County Commissioners of Cuyahoga County and the park board, with the United States of America; and that his use of the port is strictly in accordance with such agreement in his capacity as a citizen and taxpayer.

The defendant's cross-petition incorporates the affirmative allegations of his answer and then alleges that in 1939 and 1940, the plaintiff, city of Lakewood, and the County Commissioners of Cuyahoga County, entered into an agreement with the United States of America that they would contribute to the construction of a breakwall along the east bank of Rocky River, a part of which breakwall was to be used as a public dock, to be known as the ''Port of Lakewood'' and to furnish the right of ingress equally to all, in consideration for which the federal government was to dredge parts of Rocky River and extend and repair the breakwall in Lake Erie at the mouth of said river; and that, thereafter, the breakwall was constructed by the city

and the county, the park board furnishing some materials, services and equipment and Port Lakewood was thereby established with egress available over one of the park roadways.

' It is alleged further that the city of Lakewood and the county of Cuyahoga are wrongfully attempting to surrender the power to manage and police such port, and that the plaintiff is, under such authority, attempting to exclude this defendant as a taxpayer and member of the public from his lawful right to use the facilities of Port Lakewood to his damage. This defendant seeks to enjoin the park board from interfering with his lawful use of Port Lakewood.

A second cause of action alleges that in 1948 this defendant entered into certain agreements with the county commissioners for the use of county property fronting on the east side of Rocky River and just north of Port Lakewood to operate a private fishing enterprise, and, upon the faith of such agreement, purchased boats and materials and acquired the right to use the property directly adjacent to the county property to the north and expended large sums in developing such property into his private business, and that the plaintiff has wrongfully denied this defendant and the public the right to pass over the land owned by the county directly from Port Lakewood to the property of the defendant to the north. This defendant then seeks damages from the plaintiff and the city of Lakewood for wrongfully appropriating a portion of Port Lakewood so as to exclude the public from its use; for unlawfully prohibiting this defendant and the public from free access to Port Lakewood, or the normal use of its facilities; for discriminating against this defendant in attempting to prevent him from running chartered boats and taking parties from Port Lakewood while permitting others to do so; for putting chains across the public highways leading to Port

Lakewood; and for failing to provide suitable launching facilities, mooring bits and dock area as agreed to for public use. This defendant then seeks damages for such alleged wrongful conduct on the part of plaintiff and the city of Lakewood.

The affirmative allegations of the defendant's answer and cross-petition are denied by answers and replies so that issues are made up on the affirmative allegations of the parties.

We find the facts as established by the evidence to be as follows:

The city of Lakewood is the owner of land known as Lincoln Park (in one or two places referred to as Scenic Park) consisting of about 79 acres in Rocky River Valley just south of the Detroit Road Bridge over Rocky River. A very small portion of the land is on the west bank of the river and by far the greater part is on the east bank. The north line of park land is contiguous to the right of way owned by the county upon which is built the Rocky River Bridge. The city of Lakewood, by agreement dated April 18, 1924, transferred the ''control'' of the park lands to the Board of Park Commissioners of the Metropolitan Park District with the right to develop such lands into a part of the Metropolitan Park System. The city of Lakewood, under the agreement, purchased two properties necessary for access to Lincoln Park from the east end of the Rocky River Bridge. The entrance to the present park and recreational facilities, including Port Lakewood, is in part over these two lots, purchased for that purpose by the city of Lakewood, and the road was built under the terms of the agreement. The park board also proceeded with the development of play grounds, picnic areas and other recreational facilities as was true of property acquired by it as a part of the Metropolitan Park System.

Rocky River Harbor is located at the mouth of

Rocky River, the stream having been recognized and used as a navigable waterway at least for a distance of 4,000 feet from Lake Erie for a long period of time. The federal government in 1876 appropriated about $35,000 to improve the harbor. They built a 900-foot stone and lumber crib pier into the lake at the east side of the mouth of Rocky River, provided for a 100-foot entrance, and dredged the entrance channel from four to ten feet deep. This work was completed in 1876. Between 1931 and 1935, some part of the pier was removed and the 100-foot entrance was dredged to a depth of 10 feet and 250,000 yards of shale removed over an area from the mouth of the river to a point at least 4,000 feet from the mouth to a depth of 12 feet. The shale was used by the federal government in constructing the Cleveland Harbor.

By the Harbor Act of August 30, 1935, passed by the Congress of the United States, an investigation or survey of Rocky River Harbor was provided for. A report was submitted by the army engineers to the Secretary of War on November 7, 1936, which, in part, provides:

"3. The adjoining residential communities of Lakewood on the east and Rocky River on the west, with populations of 72,000 and 6,000 respectively, are included in the Cleveland metropolitan area. It is reported that 200 pleasure craft ranging in length from 10 to 75 feet, and 2 fishing boats, are based at Rocky River harbor, and that approximately 100 pleasure boats from other ports visit the locality each year. The commerce of the harbor is limited to the catch of the two fishing boats, reported to average 400 tons annually.

"4. The most suitable plan of improvement is found by the reporting officers to be the restoration of the east pier to its former length of 900 feet and the enlargement of the entrance channel to a width of 100

feet, and depth of 10 feet to a point 600 feet from the inner end of the pier, estimated to cost $48,000 for new work, and $1,500 annually for maintenance of the entire project.

"5. The Board of Engineers for Rivers and Harbors has fully considered the reports of the district and division engineers and the information presented by local interests at hearings before the board. It finds that Rocky River Harbor is used principally as a base for the local fleet of small pleasure craft and concludes that the improvement of interior channels, used largely for the mooring of this fleet, should properly be undertaken by those interests directly benefited. The proposed restoration of the entrance pier and dredging to prove a satisfactory entrance channel, constitute an appropriate measure of federal participation, but this work should be conditioned upon the provisions of local interests of land facilities adequate to insure full use of the improvement by the general public. The board accordingly recommends the improvement proposed, subject to the provision that local interests provide a suitable public landing with adequate service facilities and highway connection.

"6. After due consideration of these reports, I concur in the views and recommendations of the board. The value of the improvement to general small-boat navigation warrants the measure of federal participation proposed. I therefore recommend that the present project for improvement of Rocky River Harbor, Ohio, be modified to provide for an east entrance pier 900 feet in length, to be secured by a lakeward extension of the present pier, and an entrance channel 100 feet wide and 10 feet deep extending from that depth in the lake to a point 600 feet inside the inner end of the pier; all as indicated on the accompanying map and at an estimated cost of $48,000 for new work with maintenance estimated at $1,500 annually for the en-

tire project; *provided that the proposed pier extension shall not be undertaken until local interests shall have given assurances satisfactory to the Secretary of War that they will provide a suitable landing with adequate service facilities and highway connection, open to the users of the waterway on equal terms to all.*" (Emphasis added.)

The Board of Park Commissioners, the city of Lakewood, and the county commissioners thereafter in 1939 tried to develop a joint WPA project to build the necessary retaining wall along the east river bank for a public dock just south of the Rocky River Bridge, as in part required (document No. 70, engineers report quoted herein *supra*) for federal aid in dredging the harbor. The park board plans were approved by the United States government and the director testified that the job was to be done in such a way as to use hand labor to the fullest extent.

Resolution No. 1916 of the park board, dated April 10, 1939, provides in part:

"Whereas, the federal government, thru the United States engineers office, in justification for the doing of this work, has insisted that in addition to the increased boating facilities and safety afforded to those of the public who may have access to the private docks along Rocky River within so-called Clifton Park and the Yacht Club Island, that a dock available to the general public shall be provided upon publicly owned land, available by public drives to connecting thoroughfares; and

"Whereas, that portion of the Rocky River Reservation known as "Scenic Park" and lying along the right or east bank of the river, and under the control of this board comes within the conditions set forth by the government engineers; and

"Whereas, preliminary plans for such a dock have

been prepared and submitted to the United States engineers, and have been approved by them, as satisfying their requirements with reference to the public dock; and

"Whereas, the construction of this dock and wall has been set up as a WPA project requiring a sponsor's contribution of approximately $16,000; * * *." (The plans above referred to were drawn by park board engineers.)

The resolution clearly indicated that property under park board control and drives therein established were to be used to procure the government participation in the improvement of Rocky River.

The resolution indicated also that the contribution of the city of Lakewood was to be $5,500; that of Cuyahoga County $6,000 and that of the park board $4,500, to be contributed in drawing plans, supervising the job and furnishing materials now within the park.

The project did not go through, so in 1940 the city of Lakewood by the expenditure of $8,000, plus the cost of filling in behind the retaining wall, the county of Cuyahoga expending $7,350 and the park board a trifling sum in labor and materials, built the sheet steel piling dock with oakwhales four feet, six inches from the top of the dock on the river side. The dock begins at a point 15 feet to the north of the south line of the county property and proceeds south along the east bank of the river about 475 feet to a concrete wall previously constructed by the city of Lakewood. Two hundred seventy four feet of this sheet steel wall was to be the public dock, to be known as the "Port of Lakewood" and the foregoing sums were spent with full knowledge on the part of the park board, and without objection on its part, that assurance had been made to the United States government that roads within the park would be used for access to the port.

The legislation of the city of Lakewood, in part providing for this improvement, is to be found in resolution No. 3077, Sections 1 and 2, which provide:

"Section 1. That it is declared to be the intention of the council by the construction of a steel piling retaining wall and dock in Lincoln Park on the easterly shore of Rocky River in Lakewood, to provide a suitable small-boat landing with adequate service facilities consisting of mooring bits and a roadway to the dock, open to the users of Rocky River on equal terms to all; and that the Director of Public Works is hereby authorized and directed to give assurances satisfactory to the Secretary of War of the intention of the city of Lakewood to provide such suitable landing, adequate service facilities and highway connections, to the extent necessary to carry out the intent of this resolution.

"Section 2. That said dock or small-boat landing when completed shall be termed and known as The Port of Lakewood * * *."

The mayor of Lakewood notified the army engineers that legislation providing for a suitable boat landing with adequate highway facilities had passed, as required by them, for the improvement of Rocky River, whereupon the engineers advised that upon receiving a copy of resolution 3077 with assurances (that a public dock would be provided) "the Secretary of War has approved, the above ordinance and assurances, as complying with the requirements of local cooperation as specified in house document No. 70, 75th Congress, first session." Thereafter all parties proceeded and the "Port of Lakewood" became a reality early in 1941.

From 1941 to 1948 the port was used by many persons as a public port and dock, including some commercial interests such as fishermen, boat liveries and the like. Defendant, Krumreig, and a Mr. Cotleur, who now runs a boat livery concession granted by

the park board at the Port of Lakewood, were among those who used it in this fashion. In 1948 the defendant, Krumreig, who then had a boat livery on the west bank of Rocky River, leased land immediately north of the county property (the right of way for the Detroit-Rocky River Bridge) and transferred his business to that location. His business was and is devoted to supplying boats for fishing parties and excursions on Lake Erie. He has 24 fourteen-foot rowboats, or boats upon which outboard motors can be used, and three large motorboats. His lease provided for the right to build a stairway up the steep east bank of the river to the bridge or street some 40 or 50 feet above, which would provide egress for people on foot (no such stairway, however, was ever built). There was no physical way in which vehicular traffic could reach the place where he had provided docks and mooring for the boats used in his business on his leased property.

The east abutment of the Rocky River Bridge was built very close to the water's edge. There is, however, a very narrow footpath across the full width of the county property between the abutment and the river. The bridge abutment is 56 feet wide, the right of way 78 feet wide to the abutment wall facing the river and then it widens to 100 feet, the extra width extending to the south and west so that the first 15 feet of the river side of the Port of Lakewood extending back five to ten feet is on county property and the footpath leading from the port to go under the bridge is all on county property until it reaches defendant, Krumreig's, property to the north.

When Krumreig moved his business to the east side of the river north of the bridge, he used the "Port of Lakewood" (as was true when his business was conducted on the west side of the river) to load materials on flat boats and to launch his boats there for transportation to his place of business. He used a park

drive beginning at Sloan Avenue at the east end of the Rocky River Bridge and running from there to the port to transport his goods there either by truck or automobile. Trades people also used this method to make deliveries to him and on a few occasions Krumreig picked up and discharged passengers there. Many of his customers drive to the port, park their automobiles in the parking lot provided by the park board nearby, and then walk to Krumreig's place of business from the port over the path just described. During the summer of 1948, defendant, Krumreig, was granted permission by the county to build a floating dock 80 feet long in 20-foot sections (two being six feet wide and two being eight feet wide) under the bridge close to the east bank of the river from the port to defendant's property for the use of his customers in reaching his place of business.

In 1949, the park board, through its director, induced the county to let the park officials police the county property north of Lincoln Park (right of way for Rocky River Bridge), which request was granted, and in doing so induced the county to refuse to lease the county property under the bridge to the defendant, which it had by resolution agreed to do if he was the highest bidder, whereby his right to the floating dock under the bridge was terminated. The park board also put posts on each side of the drive leading to the port some 250 feet from its northerly end, and some 60 feet east of the river, and fixed a chain on the posts across the drive with a "No parking" sign suspended in the middle. The director of the park system testified that the purpose of the chain was to prevent parking within the port area, but it had the effect of preventing many citizens from unloading materials at the dock. The chain was later removed.

The park board also erected signs on the border line between the county property and Lincoln Park, which

read: "Stop. This is not a public way. Do not tres-pass." These were later replaced by signs reading: "North line of park property, Not a public way." The park director after being asked what happened to the first signs testified: "I did not see them disappear. They may have evaporated into thin air."

He testified also that the purpose of the signs "was to indicate that the park land there was not a public way to his [Krumreig's] commercial operation."

On July 29, 1949, the park director wrote a letter to the county commissioners seeking authority to erect a fence on the line of the bridge across the north side, a part of the letter reading: "To prevent continuous trespass from park property northerly along the river. We find the general public is using a path under the bridge as a means of getting to private property north of the bridge."

The county, by resolution of August 6, denied the request and no fence was erected on the county's norther-ly line. The park board filed this action on July 27, 1949, seeking to enjoin defendant, Krumreig, as above set forth.

We come now to a consideration of the rules of law applicable to the foregoing findings of fact. The plaintiff's action is in equity. The burden is upon the park board to show, with that clearness which is al-ways necessary to move a court of equity to interfere, a state of facts which constitutes a wrong, an injustice, or which causes irreparable damage for which the law provides no adequate remedy.

The plaintiff's case begins with a consideration of its right to control that part of Lincoln Park in which the "Port of Lakewood" has been established and the park roadway or drive leading from the port to Sloan Avenue at the east end of the Rocky River Bridge, and to exclude the defendant, Krumreig, from using the port and drive in the operation of his business north

of the Rocky River Bridge. The plaintiff's rights in Lincoln Park do not rise to the dignity of a leasehold under the contract of April 14, 1924. Its interests are those of a licensee, revocable under certain conditions. The last paragraph of the agreement provides:

"It is understood and agreed that control of the premises herein referred to shall not confer upon the Board of Park Commissioners any rights or title other or different than herein expressly provided and particularly that such control shall not ripen into any title by adverse possession."

No such provision would, under any circumstances, have been necessary had it been the intention of the parties that the park board should be vested with even a limited title under the agreement. After the agreement was signed and the park board took control, the city was still possessed of an unlimited fee in the property. No time being fixed by the agreement within which the park board's use of the property was to terminate, its control continued at the will of the city.

There is not the slightest doubt that the park board joined in inducing the federal government to expend money in expanding Rocky River Harbor upon assurances that a public port would be established on public property with a road leading to a public thoroughfare. This could mean nothing else than that the park board would make available the park road leading from the proposed site of the port to the nearest available public highway. The board's resolution of April 10, 1939, referred to above, is clear upon this point. And while the WPA project which was the subject of such resolution never came into being, yet the project was continued and completed with clear assurances to the federal government that the Port of Lakewood would be available to the general public by a proper roadway, of which the park board had full knowledge and acquiesced therein. It is, therefore, estopped

from seeking to enjoin the use of the roadway and the ground around the port, of sufficient size to make its use possible to the fullest extent and necessary for its practical use as a public port.

From its very beginning, the port was used for private and limited commercial purposes. As noted above, the park board's boat livery concessionaire is now located directly in front of the port and, like the defendant, makes the same use of it for commercial purposes as when he was located on the west side of the river. The plaintiff has failed to show any clear legal right to interfere with defendant's use of the port and the driveway leading to it from Sloan Avenue.

Defendant has an absolute right to use the roads leading to the Port of Lakewood for all purposes whatsoever, including the transportation of goods, boats and equipment to be transported by water to his place of operations. This right, however, is limited to the use of the Port of Lakewood but does not include a right over objections of the plaintiff to transport such materials, goods and equipment from the Port of Lakewood to his place of business by land. Defendant and his employees, as members of the public, do not commit a trespass in walking from park property to defendant's place of business.

It is true that by Section 1545.09, Revised Code, the park board has been vested with power to adopt bylaws, rules and regulations to govern the use of property under control of the park board. There is, however, nothing in the rules published in 1941 which would in any way conflict with the commercial use of a public port established by the city of Lakewood on its land in control of the park board and, in the creation of which, the park board had acquiesced, and had taken some part in its construction, or that would prevent access to it over park roads to make the port available to all on equal terms. Nor could rules passed

subsequently have any effect with respect to the use of roads thus dedicated to serve the needs of the port under the joint sponsorship of the county commissioners and the city of Lakewood, in which the park board took part.

The claim that defendant, Krumreig, induced citizens to come upon the lands under the control of the plaintiff, leave their automobiles in parking spaces provided for that purpose, and then ''trespass'' on the land under the control of plaintiff for park and recreational purposes in walking to defendant's place of business to go fishing or for a boat ride on Lake Erie does not show facts which will afford the plaintiff the right to an injunction. The plaintiff's duty is to afford the public opportunity for pleasure and recreation. Fishing and boating come clearly within such purposes. If it were not so, the plaintiff would have no right to grant boat livery and fishing concessions at and within the Port of Lakewood as it has done. The park board should have no concern with what facilities members of the public use in seeking their recreation. The walking across a roadway or within the limits of the public port, or over a stony path under an abutment where the greater part of the property is owned by the county, and over which the park board has only the right to police and keep order, violates no reasonable rules of a park board seeking to further and provide recreation for the leisure hours of the people.

We must, therefore, dismiss plaintiff's petition at its cost, including the cost of the transcript of the evidence filed under the stipulation of the parties.

The cross-petition of defendant, Krumreig, seeks damage against the plaintiff and the city of Lakewood, for wrongfully interfering with his business. There is no evidence supporting any of the allegations of the cross-petition against the city of Lakewood, and, as to that defendant, the cross-petition is dismissed.

As to the plaintiff, there is some evidence which might tend to support a concerted effort to wrongfully interfere with the defendant's business. The stretching of a chain across the road to the port, putting up ''No trespass'' signs at the end of the park property near the path on county property leading to defendant's place of business, and the attempt to completely fence off any egress to defendant's property tend to establish such claims.

If the board was interested in the alleged trespassing on property under its control, the signs should have been turned the other way. But even though there is such evidence before the court, there is not a word of evidence showing that the defendant, Krumreig, suffered any damage because of the attempt of plaintiff to prevent members of the public from using his facilities. The court, therefore, enters judgment for the costs of the cross-petition against the plaintiff.

A journal entry is ordered to conform to findings of fact and law in this opinion.

*Judgment accordingly.*

HURD, P. J., and KOVACHY, J., concur.

(Decided January 4, 1954.)

ON MOTION for new trial.

SKEEL, J. The plaintiff's motion for a new trial presents two questions for consideration as follows:

1. The judgment and decree of the court is not sustained by the evidence.

2. The judgment and decree is contrary to law.

The plaintiff's claim is that its petition should not have been dismissed in its entirety as the court's opinion and journal entry in part sustain the right of

plaintiff to some of the relief prayed for. Such claim is well taken. This court in its opinion, in limiting the extent to which defendant was privileged to use the public roadway leading to the "Port of Lakewood" and such property adjacent thereto as would be necessary to make reasonable use of such port, which of course would include parking facilities as provided at the port, said that the privilege to which the defendant was legally entitled to in the port and the roadway leading thereto "does not include a right, over the objection of plaintiffs, to transport such materials, goods and equipment from the Port of Lakewood to his place of business by land."

The journal entry is, therefore, ordered amended, striking therefrom the order to dismiss the plaintiff's petition in its entirety and granting such relief as is not inconsistent with the rights of defendant to use the roadway to the port, the port facilities, and the necessary facilities associated therewith, as outlined in the court's opinion. All other claims under the first question presented by this motion are overruled.

The second part of the motion is based upon the claim that the plaintiff acting under statutory authority is in the exercise of a governmental function in the conservation of natural resources and providing for public recreation and is, therefore, immune from liability under the allegations of the defendant's cross-petition, even if supported by sufficient evidence. This question was not presented either by the pleadings or upon trial. The judgment of the court on defendant's cross-petition was that there was some evidence tending to show an effort on plaintiff's part to wrongfully interfere with defendant's business; but even if this be so, there was no evidence of damage and the costs were therefore adjudged against plaintiff on defendant's cross-petition. We hold that the plaintiff is in the exercise of a governmental function and is immune from

liability for any wrongful conduct, even if shown as charged in defendant's cross-petition.

The journal entry is, therefore, ordered amended by dismissing the defendant, Krumreig's, cross-petition. However, this being an action in equity, plaintiff invoking the jurisdiction of the court seeking to enjoin defendant, Krumreig, in the use of the Port of Lakewood for commercial purposes, and the use of the public road which is the only means of reaching the port, and the plaintiff having failed as to its principal claim, the court enters judgment against it for all costs. The journal of the court is ordered amended as herein directed and the motion for new trial is overruled.

*Judgment accordingly.*

HURD, P. J., and KOVACHY, J., concur.